UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

IN RE SEPTEMBER 11 LITIGATION

------------------------------------------------------------------

MARY BAVIS, Individually and as Personal
Representative of the Estate of Mark Bavis, deceased,

                                          Plaintiff,

      -against-

UAL CORPORATION et al.,

                                          Defendants.

------------------------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/7/11

**ORDER AND OPINION
REGULATING BURDENS OF
PROOF AND ISSUES FOR
JURY INSTRUCTIONS**

21 MC 101 (AKH)

02 Civ. 7154

ALVIN K. HELLERSTEIN, U.S.D.J.:

This case is the last remaining wrongful-death action of the 95 originally filed.

Trial is to begin November 7, 2011. The parties seek rulings on certain basic issues: (i) whether

federal law preempts state law on the standard of care applicable to Defendants' conduct; (ii)

whether, if federal law is preemptive, what is the standard regulating defendants' conduct, and

what should be the order and burdens of proof; and (iii) what categories of damages Plaintiff

may recover. In this Order and Opinion, I address the first two questions; the issue of damages

will be addressed in a later Order and Opinion.

### I.    Introductory Facts

On the morning of September 11, 2001, five terrorists—Arwan al Shehhi, Fayez

Banihammad, Ahmed al Ghamdi, Hamza al Ghamdi, and Mohand al Shehri—boarded United

Airlines Flight 175, scheduled to depart from Boston's Logan International Airport and destined

for Los Angeles. They passed through a security checkpoint controlled by United Airlines and

managed by its security contractor, Huntleigh USA Corporation. The flight left the gate at

7:58am, departed from Logan Airport at 8:14am, and reached a cruising altitude of 31,000 feet

by 8:33am. At some time between 8:42am and 8:46am, the five terrorists began their attack, using stabbing weapons, mace, and a bomb threat to kill members of the flight crew and to control the passengers. By 8:58am, it is believed, the hijackers had taken control of the airplane and diverted it toward New York City. At 9:03am, United Airlines Flight 175 struck Tower 2 of the World Trade Center. The impact caused the immediate deaths of all on board.[1]

Two weeks after the events of September 11, Congress passed the Air Transportation Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101 et seq., to provide (among other objectives) a cause of action for "damages arising out of the hijacking and subsequent crashes" of the airlines seized by terrorists that fateful day, ATSSSA § 408(b)(1), and to provide exclusive jurisdiction in the United States District Court for the Southern District of New York for all cases arising from the terrorist-related aircraft crashes of September 11, 2001, id. § 408(b)(3); see generally In re Sept. 11 Litig., 600 F. Supp. 2d 549 (S.D.N.Y. 2009).

In this case, the Plaintiff, Mary Bavis, suing on her own behalf and as the representative of the estate of her son, Mark Bavis, alleges that Defendants United Airlines and Huntleigh USA Corporation were negligent in allowing terrorists to board Flight 175 and then, using weapons, to take it over and crash it, thereby causing the death of Mark Bavis, her son. Defendants acknowledge that the events of September 11, 2001, were tragic, but deny that they were negligent.

## II.     The Governing Law

Under ATSSSA, "[t]here shall exist a Federal cause of action for damages arising out of the hijacking and subsequent crashes of . . . United flight[] 175, on September 11, 2001." Id. § 408(b)(1). The Court is to apply "the law . . . including choice of law principles, of the

---

[1] This account is taken from The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States (Official Government Ed. 2004).

State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." ATSSSA § 408(b)(2). Under New York law, as a general matter, the elements of a wrongful-death action are "(1) the death of a human being born alive; (2) a wrongful act, neglect or default of the defendant by which the decedent's death was caused, provided the defendant would have been liable to the deceased had death not ensued; (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent; and (4) the appointment of a personal representative of the decedent." Chong v. New York City Transit Auth., 441 N.Y.S.2d 24, 25-26 (N.Y. Second App. Div. 1981). A key issue in this case, and the focus of this Order and Opinion, is the second element, whether Defendants committed some wrongful act or act of negligence.

The first step in the analysis is to set out the applicable federal statutes. There are two to consider, the Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 744, and the Aviation Security Improvement Act of 1990, Pub. L. No. 101-604, 104 Stat. 3066. The Federal Aviation Act, the first statute to set out requirements and standards of safety for airlines, deals with safety in the building, maintaining, and operating of aircraft. It is codified in Chapter 447 of Title 49, and is named "Safety Regulation." The statute requires the Administrator of the Federal Aviation Administration ("FAA") to prescribe regulations that promote safe design, construction, maintenance and operation of airplanes, to conform to "minimum safety standards" that the Administrator also is to prescribe, to "reduce or eliminate the possibility or recurrence of accidents," and, in general, to "consider the duty of an air carrier to provide service with the highest degree of safety in the public interest." 49 U.S.C. § 44701. In relevant part, the statute provides:

3

(a) PROMOTING SAFETY.—The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—
  (1) Minimum standards required in the interest of safety for appliances and for the design, material construction, quality of work, and performance of aircraft, aircraft engines, and propellers;
  (2) regulations and minimum standards in the interest of safety for—
      (A) inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances;
      (B) equipment and facilities for, and the timing and manner of, the inspecting, servicing, and overhauling, and
      (C) a qualified private person, instead of an officer of employee of the Administration, to examine and report on the inspecting, servicing, and overhauling;
  (3) regulations required in the interest of safety for the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, including the reserve supply of fuel and oil carried in flight;
  (4) regulations in the interest of safety for the maximum hours or periods of service of airmen and other employees of air carriers; and
  (5) regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.
(b) PRESCRIBING MINIMUM SAFETY STANDARDS.—The Administrator may prescribe minimum safety standards for—
  (1) an air carrier to whom a certificate is issued under section 44705 of this title; and
  (2) operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats.
(c) REDUCING AND ELIMINATING ACCIDENTS.—The Administrator shall carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation. However, the Administrator is not required to give preference either to air transportation or to other air commerce in carrying out this chapter.
(d) CONSIDERATIONS AND CLASSIFICATION OF REGULATIONS AND STANDARDS.—When prescribing a regulation or standard under subsection (a) or (b) of this section or any of sections 44702-44716 of this title, the Administrator shall
  (1) consider—

4

       (A) the duty of an air carrier to provide service with the
           highest possible degree of safety in the public interest;
           and
       (B) differences between air transportation and other air
           commerce; and
    (2) classify a regulation or standard appropriate to the
       differences between air transportation and other air
       commerce.

The second set of statutes at issue was enacted as part of the Aviation Security

Improvement Act of 1990, as amendments to the Federal Aviation Act. They are codified under

the title of "Security," in a separate chapter of title 49 of the United States Code, Chapter 449.

The statutes require the FAA Administrator to prescribe regulations "requiring screening of all

passengers and [carry-on] property, to "ensure security against criminal violence and aircraft

piracy." The regulations prescribed by the Administrator are to establish a "uniform procedure

for searching and detaining passengers and property to ensure their safety."

Two provisions of the Aviation Security Improvement Act are relevant. First, 49

U.S.C. § 44901 provides:

    (a) GENERAL REQUIREMENTS.—The Administrator of the
       Federal Aviation Administration shall prescribe regulations
       requiring screening of all passengers and property that will be
       carried in a cabin of an aircraft in air transportation or intrastate
       air transportation. The screening must take place before
       boarding and be carried out by a weapons-detecting facility or
       procedure used or operated by an employee or agent of an air
       carrier, intrastate air carrier, or foreign air carrier.
    (b) AMENDING REGULATIONS.—Notwithstanding subsection
       (a) of this section, the Administrator may amend a regulation
       prescribed under subsection (a) only to ensure security against
       criminal violence and aircraft piracy and intrastate air
       transportation.
    (c) EXEMPTIONS AND ADVISING CONGRESS ON
       REGULATIONS.—The Administrator—
       (1) may exempt from this section air transportation operations,
          except scheduled passenger operations of an air carrier
          providing air transportation under a certificate issued under

5

section 41102 of this title or a permit issued under section
41103 of this title; and

(2) shall advise Congress of a regulation to be prescribed under
this section at least 30 days before the effective date of the
regulation, unless the Administrator decides an emergency
exists requiring the regulation to become effective in fewer
than 30 days and notifies Congress of that decision.

Second, 49 U.S.C. § 44903 provides:

(b) PROTECTION AGAINST VIOLENCE AND PIRACY.—The
Administrator shall prescribe regulations to protect passengers
and property on an aircraft operating in air transportation or
intrastate air transportation against an act of criminal violence
or aircraft piracy.  When prescribing a regulation under this
subsection, the Administrator shall—
(1) consult with the Secretary of Transportation, the Attorney
General, the heads of other departments, agencies, and
instrumentalities of the United States Government, and
State and local authorities;
(2) consider whether a proposed regulation is consistent with—
(A) protecting passengers; and
(B) the public interest in promoting air transportation and
intrastate air transportation;
(3) to the maximum extent practicable, require a uniform
procedure for searching and detaining passengers and
property to ensure—
(A) their safety; and
(B) courteous and efficient treatment by an air carrier, an
agent or employee of an air carrier, and Government,
State, and local law enforcement personnel carrying out
this section; and
(4) consider the extent to which a proposed regulation will
carry out this section.

Subsection (c) of this provision provides for the creation of security programs by the airlines, to

implement the security and screening requirements of subsection (b).  It provides that the

Administrator "shall prescribe regulations under subsection (b) that "require each operator of an

airport regularly serving and air carrier holding a certificate issued by the Secretary of

Transportation to establish an air transportation security program that provides a law

6

enforcement presence and capability at each of those airports that is adequate to ensure the safety of passengers." 49 U.S.C. § 44903(c).

Pursuant to the statutory delegation of authority, the FAA promulgated regulations that set forth duties for creating and effecting a security program in an airport.[2] See 14 C.F.R. Pt. 108 (2001). These regulations impose comprehensive requirements for conducting security programs in an airport, including, among other items, procedures for providing screening functions, § 108.9; control of the airplane and airport facilities, § 108.13; provision of law enforcement, § 108.15; and a number of other requirements.

The regulations impose elaborate requirements on a certificate holder (Defendant United Airlines is such a certificate holder). For example, § 108.10 requires the certificate holder to provide a Security Coordinator on the ground, and in the airplane, to "carry out . . . duties specified in the certificate holder's approved security program" to deter hijackings and sabotage attempts. Section 108.11 prohibits the certificate holder from permitting any person to bring on board a "deadly or dangerous weapon, either concealed or unconcealed, accessible to him or her while aboard." Other regulations in Part 108 provide additional requirements.

Section 108.5 requires an air carrier to create a security program and obtain approval of it from the FAA Administrator. The requirements are set forth in 14 C.F.R. § 108.7, with the overall purpose "to protect passengers and property on an aircraft operating in air transportation or intrastate air transportation against an act of criminal violence or aircraft piracy 49 U.S.C. § 44903(b). The regulation provides:

(a) Each security program required by § 108.5 shall—

---

[2] The relevant regulations, 14 C.F.R. Part 108 (2001) are attached to this Opinion and Order. Additional safety regulations exist pursuant to the Federal Aviation Act in 14 C.F.R. Part 107, but by their terms, such regulations do not speak to questions of security at issue in this case, for they impose regulatory duties on the airport operator.

7

(1) Provide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy;

(2) Be in writing and signed by the certificate holder or any person delegated authority in this matter;

(3) Include the items listed in paragraph (b) of this section, as required by § 108.5; and

(4) Be approved by the Administrator.

(b) Each security program required by § 108.5 must include the following, as required by that section:

(1) The procedures and a description of the facilities and equipment used to perform the screening functions specified in § 108.9.

(2) The procedures and a description of the facilities and equipment used to perform the airplane and facilities control functions specified in § 108.13.

(3) The procedures used to comply with the applicable requirements of § 108.15 regarding law enforcement officers.

(4) The procedures used to comply with the requirements of § 108.17 regarding the use of X-ray systems.

(5) The procedures used to comply with the requirements of § 108.19 regarding bomb and air piracy threats.

(6) The procedures used to comply with the applicable requirements of § 108.10.

(7) The curriculum used to accomplish the training required by § 108.23.

(8) the procedures and a description of the equipment used to comply with the requirements of § 108.20 regarding explosives detection systems.

(c) Each certificate holder having an approved security program shall—

(1) Maintain at least one complete copy of the approved security program at its principal business office;

(2) Maintain a complete copy or the pertinent portions of its approved security program or appropriate implementing instructions at each airport where security screening is being conducted;

(3) Make these documents available for inspection upon request of any Civil Aviation Security Inspector;

(4) Restrict the distribution, disclosure, and availability of sensitive security information, as defined in part 191 of this chapter, to persons with a need-to-know; and

(5) Refer requests for sensitive security information by other persons to the Assistant Administrator for Civil Aviation Security.

8

Additional subparts of Section 108, identified in the subparts of § 108.7(b), provide additional detail for the certificate holder's security program, as well as its obligations with respect to the duties set out.

Section 108.25 sets out the process by which the FAA Administrator considers and approves the certificate holder's proposed security program. The regulation provides that the certificate holder is to submit the proposed plan no less than 90 days before intended flight operations, and that the Administrator, within 30 days of receipt, "either approves the program or notifies the certificate holder to modify the program to comply with the applicable requirements of this part." 14 C.F.R. § 108.25(a). Nothing in the regulation, however, sets out the criteria the Administrator is to use to decide if a proposed security program is "adequate" to protect passengers and their property against crimes of violence and air piracy. 49 U.S.C. § 44903(c).

## III.  Discussion

### a.  Federal Preemption

The parties dispute whether the federal law and regulations discussed above preempts state law. Defendants argue that the comprehensiveness and uniformity of the federal law and regulations show that Congress intended for federal law to govern issues of aviation safety and security, to the exclusion of state law. Plaintiff disagrees, arguing that the term "minimum standards" in § 44701(a) of the Federal Aviation Act shows a congressional intent to incorporate state law standards of reasonableness.

The Supremacy Clause of the Constitution establishes that federal law "shall be the supreme law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. The question of preemption "is basically one of congressional intent," which asks, "[d]id Congress, in enacting the Federal Statute, intend

9

to exercise its constitutionally delegated authority to set aside the laws of a State?" Barnett Bank

of Marion County, N.A. v. Nelson, 517 U.S. 25, 30 (1996). Such an intention may be seen in "a

scheme of federal regulation so pervasive as to make reasonable the inference that Congress left

no room for the States to supplement it." Id. at 31 (quoting Rice v. Santa Fe Elevator Corp., 331

U.S. 218, 230 (1947)).

               In Air Transport Association of America, Inc. v. Cuomo, 520 F.3d 218 (2d Cir.

2008) (per curiam), the Court of Appeals ruled, in *dicta*, that "[t]he FAA was enacted to create a

uniform and exclusive system of federal regulation in the field of air safety."[3] Id. at 224 (quoting

City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 639 (1973)). The Act "was

passed by Congress for the purpose of centralizing in a single authority—indeed, in one

administrator—the power to frame rules for the safe and efficient use of the nation's airspace."

Air Line Pilots Ass'n, Int'l v. Quesada, 276 F.2d 892, 894 (2d Cir. 1960). As Air Transport

Association noted, "[t]he intent to centralize air safety authority and the comprehensiveness of

these regulations pursuant to that authority have led several other circuits (and several courts

within this Circuit) to conclude that Congress intended to occupy the entire field and thereby

preempt state regulation of air safety." 520 F.3d at 225. The rule of preemption reflects a

dominant view in the federal courts. See U.S. Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1326

(10th Cir. 2010); Montalvo v. Spirit Airlines, 508 F.3d 464, 468 (9th Cir. 2007); Greene v. B.F.

Goodrich Avionics Sys., Inc., 409 F.3d 784, 795 (6th Cir. 2005); Abdullah v. Am. Airlines, Inc.,

---

[3] Air Transportation Association held that the state law at issue, the New York Passenger Bill of Rights, New York Gen. Business Law § 251-g (McKinney 2008), was expressly preempted by 49 U.S.C. § 41713(b), a provision of the Airline Deregulation Act of 1978, Pub. L. No. 85-726, 72 Stat. 731. The case went on, however, to rule in extensive *dicta* that the New York law was likely also preempted under implied preemption principles. 520 F.3d at 224-25. In Goodspeed Airport LLC v. east Haddam Inland Wetlands & Watercourses Commission, 634 F.3d 206, 210 (2d Cir. 2011), the Court of Appeals adopted the *dicta* of Air Transportation Association and held that "Congress intended to occupy the field of air safety."

181 F.3d 363, 367-68 (3d Cir. 1999); French v. Pan Am Express, Inc., 869 F.2d 1, 5 (1st Cir.
1989).

In Goodspeed Airport LLC v. east Haddam Inland Wetlands & Watercourses
Commission, 634 F.3d 206 (2d Cir. 2011), the Second Circuit Court of Appeals adopted the
language of American Transport Association and held that "Congress intended to occupy the
field of air safety," id. at 210, and that if "state regulation sufficiently interferes with federal
regulation . . . it should be deemed preempted," id. at 211 (quoting Gade v. Nat'l Solid Wastes
Mgmt. Ass'n, 505 U.S. 88, 107 (1992)). In that case, however, the state environmental
regulation required a permit to cut down trees on wetlands, and the Court found that the
requirement did not sufficiently interfere with federal aviation regulations to be preempted. Id.
at 211.

Unlike Goodspeed Airport, Plaintiff's argument for a state standard of care would
directly affect federal standards and contradict the statutory requirement that the FAA
Administrator, "to the maximum extent practicable, require a uniform procedure to searching and
detaining passengers and property," 49 U.S.C. § 44903(b)(3), "to protect passengers and
property on an aircraft operating in air transportation or intrastate air transportation against an act
of criminal violence or aircraft piracy," id. § 44903(b). Congress delegated to the Administrator,
not the States, the power to determine the appropriate standards of care, and it is the
Administrator who must do so, after careful consultation with the Secretary of Transportation,
the Attorney General, the heads of other departments, agencies and instrumentalities of the
United States Government, and State and local authorities. 49 U.S.C. § 44903 (b)(1). The
federal statutes, and the regulations promulgated thereunder, make clear that there is no room for
such state law. In re Air Crash Near Clarence Center, New York, on Feb. 12, 2009, 09 MDL

11

2085 2011 WL 2848812, at *2 (July 28, 2011). The statutory mandate for uniformity is inconsistent with Plaintiff's argument that state law should be considered along with federal regulations, for air carriers then would be subjected to an untenable mixture of 50 different state legal regimes, and not to a uniform federal legal regime. Id. at *3.

Plaintiff argues that § 44701(a)(5) of the Federal Aviation Act, the 1958 law dealing with issues of design, construction, maintenance and operations of aircraft, shows an intent to supplement federal law with state law because it directs the FAA Administrator to promulgate "minimum standards." The phrase does not appear in the 1990 amendments to the Federal Aviation Act, promulgated in the Aviation Security Improvement Act, dealing with security and screening issues to protect against criminal violence and air piracy. Those sections require the Administrator to promulgate regulations that require "a uniform procedure for searching and detaining passengers"; the law does not mention "minimum standards." See 49 U.S.C. § 44903(b)(3). But even if the "minimum standards" approach were to apply, that would be a direction to the FAA Administrator, not an open door to litigants and courts to second-guess the Administrator.

### b. The Standard of Care

Defendants contend that under the applicable governing federal statute, the Aviation Security Improvement Act, and the regulations promulgated under 14 C.F.R. Part 108, and United Airlines' own security program as approved by the FAA Administrator, there can be no inquiry into whether their conduct was "reasonable." The issue at trial rests on Defendants' substantial compliance with governing statute, regulations, and security programs. Plaintiff argues that the Aviation Security Improvement Act, as an amendment to the Federal Aviation Act, incorporated the "minimum standards" approach of the original Act, and thus a

12

reasonableness inquiry remains the ultimate test. Plaintiff would have this Court instruct the jury, not only if Defendants substantially complied with regulations, but also if they acted reasonably in the circumstances.

Section 44701 of the Federal Aviation Act, dealing with "aviation safety," speaks to the physical aircraft, and to the operations of the aircraft. The FAA Administrator promulgations are to satisfy "minimum standards," with regard to discrete matters like quality of the materials used and operating capacity of the engines, § 44701(a)(1); to the rigors for inspecting the aircraft, § 44701(a)(2); to needed reserve supplies for the aircraft, § 44701(a)(3); and to regulate the number of hours of flight attendants and pilots. § 44701(a)(4). There is also the catchall provision of § 44701(a)(5), "for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security," but this catchall must be read in light of the rest of § 44701(a), for the statute must be construed as a whole. Nat. Res. Def. Council v. Abraham, 355 F.3d 179, 195 (2d Cir. 2004).

The relevant provisions of the Aviation Security Improvement Act were enacted more than 30 years after the promulgation of the Federal Aviation Act, as a direct response to the 1988 terrorist-related bombing of Pan American World Airways Flight 103, over Lockerbie, Scotland. See *Aviation Security Improvement Act of 1990: Hearing and Markup of H.R. 5200 Before H. Comm. on Foreign Affairs, H. SubComm. on Aviation and the H.Comm. on Public Works and Transportation*, 101st Cong. at 15 (1990) (statement of Ann McLaughlin, former chairmen, President's Commission on Aviation Security and Terrorism). In response to the Lockerbie disaster, a Presidential Commission on Aviation Security and Terrorism was formed pursuant to an Executive Order, to ascertain "the truth about the events leading up to the tragedy, and to assure changes to the nation's aviation security system to prevent further such disasters."

13

Id. at VII (report attached to legislative history). The Commission evaluated the then-current

state of the aviation industry, identified weaknesses, and proposed dozens of improvements in

security measures, many dealing with an increased presence of federal regulation. See id. at 18-

35 (report of Ann McLaughlin).

The President's Commission reported, and Congress found, that the Lockerbie

disaster represented an evolving worldwide terrorist threat to the aviation industry. See id. at 2

(statement of Sen. Lautenberg). Congress therefore undertook a vigorous enhancement of

federal control over the area of aviation security. Central to Congress' decision to increase

federal control of aviation security was the decision to provide the FAA Administrator with

greater control over security, by directing the Administrator to promulgate regulations "to protect

passengers and property," 49 U.S.C. § 44903(b), and not "minimum standards," 49 U.S.C.

§ 44701(a)(5), for security. Congress reserved for itself the right to review the Administrator's

regulations before their promulgation. See 49 U.S.C. § 44901(c)(2) (directing the Administrator

to "advise Congress of a regulation to be prescribed under this section at least 30 days before the

effective date of the regulation.").

The Aviation Security Improvement Act provides specifically that the

Administrator must provide regulations for appropriate weapons-detecting facilities, 49 U.S.C.

§ 44901(a), and is to consult with the Attorney General, the Secretary of Transportation, and

various other federal and state officials in promulgating appropriate regulations, id. § 44903(b).

Such regulations must, "to the maximum extent practicable, require a uniform procedure for

searching and detaining passengers and property to ensure" safety and courteous treatment of

passengers. Id. § 44901(b)(3). Additional statutory provisions direct airlines to provide

information about threats to civil aviation to federal authorities, § 44905(a), and direct the

14

Central Intelligence Agency, the National Security Agency, the Federal Bureau of Investigation, and other federal departments to conduct intelligence gathering and provide reports to the FAA and the Secretary of Transportation, § 44911(b). The FAA Administrator also is to conduct research and development on counterterrorism efforts for the aviation industry. 49 U.S.C. § 44912.

Congress created a comprehensive federal scheme to provide for aviation security specifically designed to protect persons and property of passengers against violence and terrorism. The detailed, comprehensive regulatory security regime sets out a uniform system of duties and requirements, not minimum standards to be interpreted in different ways, in different cases.

Notwithstanding these observations, I have not yet seen Defendants' security program, or considered the manner in which it was considered "adequate to ensure the safety of passengers," the statutory criteria of 49 U.S.C. § 44903(c). The parties have not briefed the degree of deference to give to Defendants' security program or its approval, or whether standards of reasonableness should govern specific applications of procedures to the persons and things passing through the check-points. And, as with all motions *in limine* of trial, my rulings expressed by this Order and Opinion are subject to consideration at trial to reflect the context of the proofs.

### c. Burdens of Production

In light of this guidance, the question remains, how shall the parties prove the second requirement of New York law governing wrongful death suits—a wrongful act, neglect or default of the Defendant by which the decedent's death was caused? See Chong, 441 N.Y.S. 2d at 25-26. As I stated at a recent conference of all counsel, Plaintiff will have to prove how the

15

terrorists seized the airplane. Subject to proof to the contrary, it will be presumed that the terrorists and the weapons they used passed through defendants' security check-points in the same way that all passengers in all airports board airplanes and bring personal effects with them. 2 McCormick on Evid. § 337 (6th ed. 2010). Defendants then will have to come forward with evidence showing due care at the check-points by complying substantially with applicable regulations and procedures. See 14 C.F.R. Part 108.

"Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof." Int'l Broth. of Teamsters v. United States, 431 U.S. 324, 359 n.45 (1977). Where a defendant has superior access to knowledge of relevant facts, courts may shift a burden to the defendant, by permitting the plaintiff to make an initial showing and obtain the benefit of a presumption. 2 McCormick on Evid. § 337. Courts should not do so lightly, but should consider whether particular circumstances warrant such burden-shifting. Id. Courts also may shift a burden of production in consideration of "the judicial estimate of the probabilities of the situation." Id. In such a scenario, the Court may shift the burden to the party "who contends the more unusual event has occurred." Id.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court employed a burden-shifting technique, to enable both the plaintiff to show a *prima facie* case of employment discrimination and the employer to show a neutral reason why the employee did not receive a favorable employment decision. Although the plaintiff retains the ultimate burden to persuade the jury, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981), the employer can be called upon to explain its hiring practices and its intentions with regard to the particular employee. McDonnell Douglas, 411 U.S. at 801-02. In Batson v. Kentucky, 476 U.S.

16

79 (1986), the Supreme Court employed the same logic to enable a criminal defendant to challenge the state's use of peremptory strikes by shifting to the prosecutor the burden to show a neutral reason for striking particular members of the venire pool. Id. at 96-98.

As in McDonnell Douglas and Batson, Defendants here seek to show that they complied with their own methods and procedures. Defendants are in the best position to show what they did and why they did it. It is appropriate to require Defendants to assume the burden to come forward with this evidence. If Defendants succeed, Plaintiff will have the ultimate burden of proving some overall failure of due care, if due care is shown to be the standard. If Defendants' substantial compliance with regulations and procedures is shown to be a defense, Defendants will have that ultimate burden of persuasion, as well as of coming forward with sufficient evidence. I defer this question to later proceedings. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 57 (2d Cir. 1998) (court decides whether presumption has been rebutted under McDonnell Douglas).

### IV.   Conclusion

Presently, the parties are scheduled to submit pretrial materials on September 2, 2011 and September 23, 2011. Those materials will be affected by this Opinion and Order, and the dates are therefore each adjourned two weeks, to September 16, 2011, and October 7, 2011. The parties shall appear for their next conference on September 19, 2011, at 10:30am. The conference shall be held at 2:30pm, in Courtroom 14D. The Clerk shall terminate the motions (Doc. Nos. 159 and 162 in No. 02 Civ. 7154).

SO ORDERED.

Dated:     September 7, 2011
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

17

the files, and the address of the location and the phone number at the location where the investigative files are maintained.

[Doc. No. 28859, 63 FR 51218, Sept. 24, 1998; 63 FR 60448, Nov. 9, 1998]

## PART 108—AIRPLANE OPERATOR SECURITY

Sec.
108.1   Applicability.
108.3   Definitions.
108.4   Falsification.
108.5   Security program: Adoption and implementation.
108.7   Security program: Form, content, and availability.
108.9   Screening of passengers and property.
108.10  Prevention and management of hijackings and sabotage attempts.
108.11  Carriage of weapons.
108.13  Security of airplanes and facilities.
108.14  Transportation of Federal Air Marshals.
108.15  Law enforcement officers.
108.17  Use of X-ray systems.
108.18  Security Directives and Information Circulars.
108.19  Security threats and procedures.
108.20  Use of explosives detection systems.
108.21  Carriage of passengers under the control of armed law enforcement escorts.
108.23  Training.
108.25  Approval of security programs and amendments.
108.27  Evidence of compliance.
108.29  Standards for security oversight.
108.31  Employment standards for screening personnel.
108.33  Employment history, verification and criminal history records checks.

AUTHORITY: 49 U.S.C. 106(g), 5103, 40113, 40119, 44701–44702, 44705, 44901–44905, 44907, 44913–44914, 44932, 44935–44936, 46105.

SOURCE: Docket No. 108, 46 FR 3786, Jan. 15, 1961, unless otherwise noted.

## § 108.1 Applicability.

(a) This part prescribes aviation security rules governing—

(1) The operations of holders of FAA air carrier operating certificates or operating certificates engaging in scheduled passenger operations or public charter passenger operations;

(2) Each person aboard an airplane operated by a certificate holder described in paragraph (a)(1) of this section;

(3) Each person on an airport at which the operations described in para-

graph (a)(1) of this section are conducted;

(4) Each certificate holder who receives a Security Directive or Information Circular and each person who receives information from a Security Directive or an Information Circular issued by the Director of Civil Aviation Security; and

(5) Each person who files an application or makes entries into any record or report that is kept, made or used to show compliance under this part, or to exercise any privileges under this part.

(b) This part does not apply to helicopter or to all-cargo operations.

[Doc. No. 24883, 51 FR 1352, Jan. 10, 1986, as amended by Amdt. 108–6, 54 FR 28984, July 10, 1989; Amdt. 108–14, 61 FR 64244, Dec. 3, 1996]

## § 108.3 Definitions.

The following are definitions of terms used in this part:

(a) *Certificate holder* means a person holding an FAA operating certificate when that person engages in scheduled passenger or public charter passenger operations or both.

(b) *Passenger seating configuration* means the total number of seats for which the aircraft is type certificated that can be made available for passenger use aboard a flight and includes that seat in certain airplanes which may be used by a representative of the Administrator to conduct flight checks but is available for revenue purposes on other occasions.

(c) *Private charter* means any charter for which the charterer engages the total capacity of an airplane for the carriage of:

(1) Passengers in civil or military air movements conducted under contract with the Government of the United States or the Government of a foreign country; or

(2) Passengers invited by the charterer, the cost of which is borne entirely by the charterer and not directly or indirectly by the individual passengers.

(d) *Public charter* means any charter that is not a *private charter.*

(e) *Scheduled passenger operations* means holding out to the public of air transportation service for passengers from identified air terminals at a set

time announced by timetable or schedule published in a newspaper, magazine, or other advertising medium.

(f) *Sterile area* means an area to which access is controlled by the inspection of persons and property in accordance with an approved security program or a security program used in accordance with § 129.25.

### § 108.4   Falsification.

No person may make, or cause to be made, any of the following:

(a) Any fraudulent or intentionally false statement in any application for any security program, access medium, or identification medium, or any amendment thereto, under this part.

(b) Any fraudulent or intentionally false entry in any record or report that is kept, made, or used to show compliance with this part, or to exercise any privileges under this part.

(c) Any reproduction or alteration, for fraudulent purpose, of any report, record, security program, access medium, or identification medium issued under this part.

[Doc. No. 28745, 61 FR 64214, Dec. 3, 1996]

### § 108.5   Security program: Adoption and implementation.

(a) Each certificate holder shall adopt and carry out a security program that meets the requirements of § 108.7 for each of the following scheduled or public charter passenger operations:

(1) Each operation with an airplane having a passenger seating configuration of more than 60 seats.

(2) Each operation that provides deplaned passengers access, that is not otherwise controlled by a certificate holder using an approved security program or a foreign air carrier using a security program required by § 129.25, to a sterile area.

(3) Each operation with an airplane having a passenger seating configuration of more than 30 but less than 61 seats; except that those parts of the program effecting compliance with the requirements listed in § 108.7(b) (1), (2), and

(4) Need only be implemented when the Director of Civil Aviation Security or a designate of the Director notifies the certificate holder in writing that a

security threat exists with respect to the operation.

(b) Each certificate holder that has obtained FAA approval for a security program for operations not listed in paragraph (a) of this section shall carry out the provisions of that program.

### § 108.7   Security program: Form, content, and availability.

(a) Each security program required by § 108.5 shall—

(1) Provide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy;

(2) Be in writing and signed by the certificate holder or any person delegated authority in this matter;

(3) Include the items listed in paragraph (b) of this section, as required by § 108.5; and

(4) Be approved by the Administrator.

(b) Each security program required by § 108.5 must include the following, as required by that section:

(1) The procedures and a description of the facilities and equipment used to perform the screening functions specified in § 108.9.

(2) The procedures and a description of the facilities and equipment used to perform the airplane and facilities control functions specified in § 108.13.

(3) The procedures used to comply with the applicable requirements of § 108.15 regarding law enforcement officers.

(4) The procedures used to comply with the requirements of § 108.17 regarding the use of X-ray systems.

(5) The procedures used to comply with the requirements of § 108.19 regarding bomb and air piracy threats.

(6) The procedures used to comply with the applicable requirements of § 108.10.

(7) The curriculum used to accomplish the training required by § 108.23.

(8) The procedures and a description of the facilities and equipment used to comply with the requirements of § 108.20 regarding explosives detection systems.

(c) Each certificate holder having an approved security program shall—

(1) Maintain at least one complete copy of the approved security program at its principal business office;

(2) Maintain a complete copy or the pertinent portions of its approved security program or appropriate implementing instructions at each airport where security screening is being conducted;

(3) Make these documents available for inspection upon request of any Civil Aviation Security Inspector.

(4) Restrict the distribution, disclosure, and availability of sensitive security information, as defined in part 191 of this chapter, to persons with a need-to-know; and

(5) Refer requests for sensitive security information by other persons to the Assistant Administrator for Civil Aviation Security.

[Doc. No. 108, 46 FR 3786, Jan. 15, 1981, as amended by Amdt. 108-3, 50 FR 28893, July 16, 1985; Amdt. 108-7, 54 FR 36946, Sept. 5, 1989; Amdt. 108-15, 62 FR 13744, Mar. 21, 1997]

### § 108.9 Screening of passengers and property.

(a) Each certificate holder required to conduct screening under a security program shall use the procedures included, and the facilities and equipment described, in its approved security program to prevent or deter the carriage aboard airplanes of any explosive, incendiary, or a deadly or dangerous weapon on or about each individual's person or accessible property, and the carriage of any explosive or incendiary in checked baggage.

(b) Each certificate holder required to conduct screening under a security program shall refuse to transport—

(1) Any person who does not consent to a search of his or her person in accordance with the screening system prescribed in paragraph (a) of this section; and

(2) Any property of any person who does not consent to a search or inspection of that property in accordance with the screening system prescribed by paragraph (a) of this section.

(c) Except as provided in its approved security program, each certificate holder required to conduct screening under a security program shall use the procedures included, and the facilities and equipment described, in its approved security program for detecting explosives, incendiaries, and deadly or dangerous weapons to inspect each person entering a sterile area at each preboarding screening checkpoint in the United States for which it is responsible, and to inspect all accessible property under that person's control.

(d) Each certificate holder shall staff its security screening checkpoints with supervisory and non-supervisory personnel in accordance with the standards specified in its security program.

[Doc. No. 108, 46 FR 3786, Jan. 15, 1981, as amended by Amdt. 108-4, 51 FR 1352, Jan. 10, 1986; Amdt. 108-5, 52 FR 48509, Dec. 22, 1987; Amdt. 108-10, 56 FR 41425, Aug. 20, 1991]

### § 108.10 Prevention and management of hijackings and sabotage attempts.

(a) Each certificate holder shall—

(1) Provide and use a Security Coordinator on the ground and in flight for each international and domestic flight, as required by its approved security program; and

(2) Designate the pilot in command as the inflight Security Coordinator for each flight, as required by its approved security program.

(b) Ground Security Coordinator. Each ground Security Coordinator shall carry out the ground Security Coordinator duties specified in the certificate holder's approved security program.

(c) Inflight Security Coordinator. The pilot in command of each flight shall carry out the inflight Security Coordinator duties specified in the certificate holder's approved security program.

[Doc. No. 24719, 50 FR 26893, July 16, 1985]

### § 108.11 Carriage of weapons.

(a) No certificate holder required to conduct screening under a security program may permit any person to have, nor may any person have, on or about his or her person or property, a deadly or dangerous weapon, either concealed or unconcealed, accessible to him or her while aboard an airplane for which screening is required unless:

(1) The person having the weapon is—

(i) An official or employee of the United States, or a State or political subdivision of a State, or of a municipality who is authorized by his or her agency to have the weapon; or

(ii) Authorized to have the weapon by the certificate holder and the Administrator and has successfully completed a course of training in the use of firearms acceptable to the Administrator.

(2) The person having the weapon needs to have the weapon accessible in connection with the performance of his or her duty from the time he or she would otherwise check it in accordance with paragraph (d) of this section until the time it would be returned after deplaning.

(3) The certificate holder is notified—

(i) Of the flight on which the armed person intends to have the weapon accessible to him or her at least 1 hour, or in an emergency as soon as practicable, before departure; and

(ii) When the armed person is other than an employee or official of the United States, that there is a need for the weapon to be accessible to the armed person in connection with the performance of that person's duty from the time he or she would otherwise check it in accordance with paragraph (d) of this section until the time it would be returned to him or her after deplaning.

(4) The armed person identifies himself or herself to the certificate holder by presenting credentials that include his or her clear, full-face picture, his or her signature, and the signature of the authorizing official of his or her service or the official seal of his or her service. A badge, shield, or similar may not be used as the sole means of identification.

(5) The certificate holder—

(i) Ensures that the armed person is familiar with its procedures for carrying a deadly or dangerous weapon aboard its airplane before the time the person boards the airplane;

(ii) Ensures that the identity of the armed person is known to each law enforcement officer and each employee of the certificate holder responsible for security during the boarding of the airplane; and

(iii) Notifies the pilot in command, other appropriate crewmembers, and any other person authorized to have a weapon accessible to him or her aboard the airplane of the location of each authorized armed person aboard the airplane.

(b) No person may, while on board an airplane operated by a certificate holder for which screening is not conducted, carry on or about that person a deadly or dangerous weapon, either concealed or unconcealed. This paragraph does not apply to—

(1) Officials or employees of a municipality or a State, or of the United States, who are authorized to carry arms; or

(2) Crewmembers and other persons authorized by the certificate holder to carry arms.

(c) No certificate holder may knowingly permit any person to transport, nor may any person transport or tender for transport, any explosive, incendiary or a loaded firearm in checked baggage aboard an airplane. For the purpose of this section, a loaded firearm means a firearm which has a live round of ammunition, cartridge, detonator, or powder in the chamber or in a clip, magazine, or cylinder inserted in it.

(d) No certificate holder may knowingly permit any person to transport, nor may any person transport or tender for transport, any unloaded firearm in checked baggage aboard an airplane unless—

(1) The passenger declares to the certificate holder, either orally or in writing before checking the baggage, that any firearm carried in the baggage is unloaded;

(2) The firearm is carried in a container the certificate holder considers appropriate for air transportation;

(3) When the firearm is other than a shotgun, rifle, or other firearm normally fired from the shoulder position, the baggage in which it is carried is locked, and only the passenger checking the baggage retains the key or combination; and

(4) The baggage containing the firearm is carried in an area, other than the flightcrew compartment, that is inaccessible to passengers.

(e) No certificate holder may serve any alcoholic beverage to a person having a deadly or dangerous weapon accessible to him or her nor may such person drink any alcoholic beverage while aboard an airplane operated by the certificate holder.

(f) Paragraphs (a), (b), and (d) of this section do not apply to the carriage of

firearms aboard air carrier flights conducted for the military forces of the Government of the United States when the total cabin load of the airplane is under exclusive use by those military forces if the following conditions are met:

(1) No firearm is loaded and all bolts to such firearms are locked in the open position; and

(2) The certificate holder is notified by the unit commander or officer in charge of the flight before boarding that weapons will be carried aboard the aircraft.

[Doc. No. 108, 46 FR 3786, Jan. 15, 1981, as amended by Amdt. 108–4, 51 FR 1352, Jan. 10, 1986]

### § 108.13  Security of airplanes and facilities.

Each certificate holder required to conduct screening under a security program shall use the procedures included, and the facilities and equipment described, in its approved security program to perform the following control functions with respect to each airplane operation for which screening is required:

(a) Prohibit unauthorized access to the airplane.

(b) Ensure that baggage carried in the airplane is checked in by a responsible agent and that identification is obtained from persons, other than known shippers, shipping goods or cargo aboard the airplane.

(c) Ensure that cargo and checked baggage carried aboard the airplane is handled in a manner that prohibits unauthorized access.

(d) Conduct a security inspection of the airplane before placing it in service and after it has been left unattended.

### § 108.14  Transportation of Federal Air Marshals.

(a) Each certificate holder shall carry Federal Air Marshals, in the number and manner specified by the Administrator, on each scheduled and public charter passenger operation designated by the Administrator.

(b) Each Federal Air Marshal shall be carried on a first priority basis and without charge while on official duty, including repositioning flights.

(c) Each certificate holder shall assign the specific seat requested by a Federal Air Marshal who is on official duty.

[Doc. No. 24714, 50 FR 27925, July 8, 1985]

### § 108.15  Law enforcement officers.

(a) At airports within the United States not governed by part 107 of this chapter, each certificate holder engaging in scheduled passenger or public charter passenger operations shall—

(1) If security screening is required for a public charter operation by § 108.5(a), or for a scheduled passenger operation by § 108.5(b) provide for law enforcement officers meeting the qualifications and standards, and in the number and manner specified, in part 107; and

(2) When using airplanes with a passenger seating configuration of 31 through 60 seats in a public charter operation for which screening is not required, arrange for law enforcement officers meeting the qualifications and standards specified in part 107 to be available to respond to an incident, and provide to its employees, including crewmembers, as appropriate, current information with respect to procedures for obtaining law enforcement assistance at that airport.

(b) At airports governed by part 107 of this chapter, each certificate holder engaging in scheduled or public charter passenger operations, when using airplanes with a passenger seating configuration of 31 through 60 seats for which screening is not required, shall arrange for law enforcement officers meeting the qualifications and standards specified in part 107 to be available to respond to an incident and provide its employees, including crewmembers, as appropriate, current information with respect to procedures for obtaining this law enforcement assistance at that airport.

### § 108.17  Use of X-ray systems.

(a) No certificate holder may use an X-ray system within the United States to inspect carry-on or checked articles unless specifically authorized under a security program required by § 108.5 of this part or use such a system contrary to its approved security program. The Administrator authorizes certificate

holders to use X-ray systems for inspecting carry-on or checked articles under an approved security program if the certificate holder shows that—

(1) For a system manufactured before April 25, 1974, it meets either the guidelines issued by the Food and Drug Administration (FDA), Department of Health, Education, and Welfare (HEW) and published in the FEDERAL REGISTER (38 FR 21442, August 8, 1973); or the performance standards for cabinet X-ray systems designed primarily for the inspection of carry-on baggage issued by the FDA and published in 21 CFR 1020.40 (39 FR 12985, April 10, 1974);

(2) For a system manufactured after April 24, 1974, it meets the standards for cabinet X-ray systems designed primarily for the inspection of carry-on baggage issued by the FDA and published in 21 CFR 1020.40 (39 FR 12985, April 10, 1974);

(3) A program for initial and recurrent training of operators of the system is established, which includes training in radiation safety, the efficient use of X-ray systems, and the identification of weapons and other dangerous articles;

(4) Procedures are established to ensure that each operator of the system is provided with an individual personnel dosimeter (such as a film badge or thermoluminescent dosimeter). Each dosimeter used shall be evaluated at the end of each calendar month, and records of operator duty time and the results of dosimeter evaluations shall be maintained by the certificate holder; and

(5) The system meets the imaging requirements set forth in an approved Air Carrier Security Program using the step wedge specified in American Society for Testing and Materials Standard F792-82.

(b) No certificate holder may use an X-ray system within the United States unless within the preceding 12 calendar months a radiation survey has been conducted which shows that the system meets the applicable performance standards in 21 CFR 1020.40 or guidelines published by the FDA in the FEDERAL REGISTER of August 8, 1973 (38 FR 21442).

(c) No certificate holder may use an X-ray system after the system is initially installed or after it has been moved from one location to another, unless a radiation survey is conducted which shows that the system meets the applicable performance standards in 21 CFR 1020.40 or guidelines published by the FDA in the FEDERAL REGISTER of August 8, 1973 (38 FR 21442) except that a radiation survey is not required for an X-ray system that is moved to another location if the certificate holder shows that the system is so designed that it can be moved without altering its performance.

(d) No certificate holder may use an X-ray system that is not in full compliance with any defect notice or modification order issued for that system by the FDA, unless that Administration has advised the FAA that the defect or failure to comply does not create a significant risk or injury, including genetic injury, to any person.

(e) No certificate holder may use an X-ray system to inspect carry-on or checked articles unless a sign is posted in a conspicuous place at the screening station and on the X-ray system which notifies passengers that such items are being inspected by an X-ray and advises them to remove all X-ray, scientific, and high-speed film from carry-on and checked articles before inspection. This sign shall also advise passengers that they may request that an inspection be made of their photographic equipment and film packages without exposure to an X-ray system. If the X-ray system exposes any carry-on or checked articles to more than 1 milliroentgen during the inspection, the certificate holder shall post a sign which advises passengers to remove film of all kinds from their articles before inspection. If requested by passengers, their photographic equipment and film packages shall be inspected without exposure to an X-ray system.

(f) Each certificate holder shall maintain at least one copy of the results of the most recent radiation survey conducted under paragraph (b) or (c) of this section and shall make it available for inspection upon request by the Administrator at each of the following locations:

(1) The certificate holder's principal business office; and

(2) The place where the X-ray system is in operation.

(g) The American Society for Testing and Materials Standard F792–82, "Design and Use of Ionizing Radiation Equipment for the Detection of Items Prohibited in Controlled Access Areas," described in this section is incorporated by reference herein and made a part hereof pursuant to 5 U.S.C. 552(a)(1). All persons affected by these amendments may obtain copies of the standard from the American Society for Testing and Materials, 1916 Race Street, Philadelphia, PA 19103. In addition, a copy of the standard may be examined at the FAA Rules Docket, Docket No. 24115, 800 Independence Avenue, SW., Washington, DC, weekdays, except Federal holidays, between 8:30 a.m. and 5 p.m.

(h) Each certificate holder shall comply with X-ray operator duty time limitations specified in its security program.

[Doc. No. 108, 46 FR 3786, Jan. 15, 1981, as amended by Amdt. 108–1, 50 FR 25656, June 20, 1985; Amdt. 108–10, 56 FR 41425, Aug. 20, 1991; Amdt. 108–11, 56 FR 43373, Sept. 24, 1991]

### § 108.18  Security Directives and Information Circulars.

(a) Each certificate holder required to have an approved security program for passenger operations shall comply with each Security Directive issued to the certificate holder by the Director of Civil Aviation Security, or by any person to whom the Director has delegated the authority to issue Security Directives, within the time prescribed in the Security Directive for compliance.

(b) Each certificate holder who receives a Security Directive shall—

(1) Not later than 24 hours after delivery by the FAA or within the time prescribed in the Security Directive, acknowledge receipt of the Security Directive;

(2) Not later than 72 hours after delivery by the FAA or within the time prescribed in the Security Directive, specify the method by which the certificate holder has implemented the measures in the Security Directive; and

(3) Ensure that information regarding the Security Directive and measures implemented in response to the Security Directive are distributed to specified personnel as prescribed in the Security Directive and to other personnel with an operational need to know.

(c) In the event that the certificate holder is unable to implement the measures contained in the Security Directive, the certificate holder shall submit proposed alternative measures, and the basis for submitting the alternative measures, to the Director of Civil Aviation Security for approval. The certificate holder shall submit proposed alternative measures within the time prescribed in the Security Directive. The certificate holder shall implement any alternative measures approved by the Director of Civil Aviation Security.

(d) Each certificate holder who receives a Security Directive or Information Circular and each person who receives information from a Security Directive or Information Circular shall—

(1) Restrict the availability of the Security Directive or Information Circular and information contained in the Security Directive or the Information Circular to those persons with an operational need to know; and

(2) Refuse to release the Security Directive or Information Circular and information regarding the Security Directive or Information Circular to persons other than those with an operational need to know without the prior written consent of the Director of Civil Aviation Security.

(Approved by the Office of Management and Budget under control number 2120–0098)

[Doc. No. 25953, 54 FR 28984, July 10, 1989]

### § 108.19  Security threats and procedures.

(a) Upon receipt of a specific and credible threat to the security of a flight, the certificate holder shall—

(1) Immediately notify the ground and in-flight security coordinators of the threat, any evaluation thereof, and any countermeasures to be applied; and

(2) Ensure that the in-flight security coordinator notifies the flight and cabin crewmembers of the threat, any evaluation thereof, and any countermeasures to be applied.

(b) Upon receipt of a bomb threat against a specific airplane, each certificate holder shall attempt to determine whether or not any explosive or incendiary is aboard the airplane involved by doing the following:

(1) Conducting a security inspection on the ground before the next flight or, if the airplane is in flight, immediately after its next landing.

(2) If the airplane is being operated on the ground, advising the pilot in command to immediately submit the airplane for a security inspection.

(3) If the airplane is in flight, immediately advising the pilot in command of all pertinent information available so that necessary emergency action can be taken.

(c) Immediately upon receiving information that an act or suspected act of air piracy has been committed, the certificate holder shall notify the Administrator. If the airplane is in airspace under other than United States jurisdiction, the certificate holder shall also notify the appropriate authorities of the State in whose territory the airplane is located and, if the airplane is in flight, the appropriate authorities of the State in whose territory the airplane is to land. Notification of the appropriate air traffic controlling authority is sufficient action to meet this requirement.

[Doc. No. 108, 46 FR 3786, Jan. 15, 1981, as amended by Amdt. 108-4, 51 FR 1352, Jan. 10, 1986; Amdt.108-9, 56 FR 27869, June 17, 1991]

### § 108.20 Use of explosives detection systems.

When the Administrator shall require by amendment under § 108.25, each certificate holder required to conduct screening under a security program shall use an explosive detection system that has been approved by the Administrator to screen checked baggage on international flights in accordance with the certificate holder's security program.

[Doc. No. 25956, 54 FR 36946, Sept. 5, 1969]

### § 108.21 Carriage of passengers under the control of armed law enforcement escorts.

(a) Except as provided in paragraph (e) of this section, no certificate holder required to conduct screening under a security program may carry a passenger in the custody of an armed law enforcement escort aboard an airplane for which screening is required unless—

(1) The armed law enforcement escort is an official or employee of the United States, of a State or political subdivision of a State, or a municipality who is required by appropriate authority to maintain custody and control over an individual aboard an airplane;

(2) The certificate holder is notified by the responsible government entity at least 1 hour, or in case of emergency as soon as possible, before departure—

(i) Of the identity of the passenger to be carried and the flight on which it is proposed to carry the passenger; and

(ii) Whether or not the passenger is considered to be in a maximum risk category;

(3) If the passenger is considered to be in a maximum risk category, that the passenger is under the control of at least two armed law enforcement escorts and no other passengers are under the control of those two law enforcement escorts;

(4) No more than one passenger who the certificate holder has been notified is in a maximum risk category is carried on the airplane;

(5) If the passenger is not considered to be in a maximum risk category, the passenger is under the control of at least one armed law enforcement escort, and no more than two of these persons are carried under the control of any one law enforcement escort;

(6) The certificate holder is assured, prior to departure, by each law enforcement escort that—

(i) The officer is equipped with adequate restraining devices to be used in the event restraint of any passenger under the control of the escort becomes necessary; and

(ii) Each passenger under the control of the escort has been searched and does not have on or about his or her person or property anything that can be used as a deadly or dangerous weapon;

(7) Each passenger under the control of a law enforcement escort is—

(i) Boarded before any other passengers when boarding at the airport where the flight originates and deplaned at the destination after all

337

other deplaning passengers have deplaned;

(ii) Seated in the rear-most passenger seat when boarding at the airport where the flight originates; and

(iii) Seated in a seat that is neither located in any lounge area nor located next to or directly across from any exit; and

(8) A law enforcement escort having control of a passenger is seated between the passenger and any aisle.

(b) No certificate holder operating an airplane under paragraph (a) of this section may—

(1) Serve food, beverage, or provide metal eating utensils to a passenger under the control of a law enforcement escort while aboard the airplane unless authorized to do so by the law enforcement escort.

(2) Serve a law enforcement escort or the passenger under the control of the escort any alcoholic beverages while aboard the airplane.

(c) Each law enforcement escort carried under the provisions of paragraph (a) of this section shall, at all times, accompany the passenger under the control of the escort and keep the passenger under surveillance while aboard the airplane.

(d) No law enforcement escort carried under paragraph (b) of this section or any passenger under the control of the escort may drink alcoholic beverages while aboard the airplane.

(e) This section does not apply to the carriage of passengers under voluntary protective escort.

§ 108.23 Training.

(a) No certificate holder may use any person as a Security Coordinator unless, within the preceding 12 calendar months, that person has satisfactorily completed the security training as specified in the certificate holder's approved security program.

(b) No certificate holder may use any person as a crewmember on any domestic or international flight unless within the preceding 12 calendar months or within the time period specified in an Advanced Qualification Program approved under SFAR 58 that person has satisfactorily completed the security training required by § 121.417(b)(3)(v) or § 135.331(b)(3)(v) of this chapter and as

specified in the certificate holder's approved security program. With respect to training conducted under § 121.417 or § 135.331, whenever a crewmember who is required to take recurrent training completes the training in the calendar month before or the calendar month after the calendar month in which that training is required, he is considered to have completed the training in the calendar month in which it was required.

[Doc. No. 24719, 50 FR 28893, July 16, 1985, as amended by Amdt. 108–8, 55 FR 40275, Oct. 2, 1990]

§ 108.25 Approval of security programs and amendments.

(a) Unless otherwise authorized by the Administrator, each certificate holder required to have a security program for a passenger operation shall submit its proposed security program to the Administrator for approval at least 90 days before the date of the intended passenger operations. Within 30 days after receiving the program, the Administrator either approves the program or notifies the certificate holder to modify the program to comply with the applicable requirements of this part. The certificate holder may petition the Administrator to reconsider the notice to modify within 30 days after receiving the notice, and, except in the case of an emergency requiring immediate action in the interest of safety, the filing of the petition stays the notice pending a decision by the Administrator.

(b) The Administrator may amend an approved security program if it is determined that safety and the public interest require the amendment, as follows:

(1) The Administrator notifies the certificate holder, in writing, of the proposed amendment, fixing a period of not less than 30 days within which it may submit written information, views, and arguments on the amendment.

(2) After considering all relevant material, the Administrator notifies the certificate holder of any amendment adopted or rescinds the notice. The amendment becomes effective not less

than 30 days after the certificate holder receives the notice, unless the certificate holder petitions the Administrator to reconsider the amendment, in which case the effective date is stayed by the Administrator.

(3) If the Administrator finds that there is an emergency requiring immediate action with respect to safety in air transportation or in air commerce that makes the procedure in this paragraph impracticable or contrary to the public interest, the Administrator may issue an amendment, effective without stay, on the date the certificate holder receives notice of it. In such a case, the Administrator incorporates the findings, and a brief statement of the reasons for it, in the notice of the amendment to be adopted.

(c) A certificate holder may submit a request to the Administrator to amend its program. The application must be filed with the Administrator at least 30 days before the date it proposes for the amendment to become effective, unless a shorter period is allowed by the Administrator. Within 15 days after receiving a proposed amendment, the Administrator either approves or denies the request. Within 30 days after receiving from the Administrator a notice of refusal to approve the application for amendment, the applicant may petition the Administrator to reconsider the refusal to amend.

### § 108.27  Evidence of compliance.

On request of the Administrator, each certificate holder shall provide evidence of compliance with this part and its approved security program.

[Doc. No. 24719, 50 FR 28894, July 16, 1985; 50 FR 35535, Aug. 30, 1985; 51 FR 44875, Dec. 12, 1986]

### § 108.29  Standards for security oversight.

(a) Each certificate holder shall ensure that:

(1) Each person performing a security-related function for the certificate holder has knowledge of the provisions of this part 108, applicable Security Directives and Information Circulars promulgated pursuant to § 108.18, and the certificate holder's security program to the extent that the performance of the function imposes a need to know.

(2) Daily, a Ground Security Coordinator at each airport:

(i) Reviews all security-related functions for effectiveness and compliance with this part, the certificate holder's security program, and applicable Security Directives; and

(ii) Immediately initiates corrective action for each instance of noncompliance with this part, the certificate holder's security program, and applicable Security Directives.

(b) The requirements prescribed in paragraph (a) of this section apply to all security-related functions performed for the certificate holder whether by a direct employee or a contractor employee.

[Doc. No. 26522, 56 FR 41425, Aug. 20, 1991]

### § 108.31  Employment standards for screening personnel.

(a) No certificate holder shall use any person to perform any screening function, unless that person has:

(1) A high school diploma, a General Equivalency Diploma, or a combination of education and experience which the certificate holder has determined to have equipped the person to perform the duties of the position;

(2) Basic aptitudes and physical abilities including color perception, visual and aural acuity, physical coordination, and motor skills to the following standards:

(i) Screeners operating X-ray equipment must be able to distinguish on the X-ray monitor the appropriate imaging standard specified in the certificate holder's security program. Wherever the X-ray system displays colors, the operator must be able to perceive each color;

(ii) Screeners operating any screening equipment must be able to distinguish each color displayed on every type of screening equipment and explain what each color signifies;

(iii) Screeners must be able to hear and respond to the spoken voice and to audible alarms generated by screening equipment in an active checkpoint environment;

(iv) Screeners performing physical searches or other related operations must be able to efficiently and thoroughly manipulate and handle such

339

baggage, containers, and other objects subject to security processing; and

(v) Screeners who perform pat-downs or hand-held metal detector searches of persons must have sufficient dexterity and capability to conduct those procedures on all parts of the persons' bodies.

(3) The ability to read, speak, and write English well enough to:

(i) Carry out written and oral instructions regarding the proper performance of screening duties;

(ii) Read English language identification media, credentials, airline tickets, and labels on items normally encountered in the screening process;

(iii) Provide direction to and understand and answer questions from English-speaking persons undergoing screening; and

(iv) Write incident reports and statements and log entries into security records in the English language.

(4) Satisfactorily completed all initial, recurrent, and appropriate specialized training required by the certificate holder's security program.

(b) Notwithstanding the provisions of paragraph (a)(4) of this section, the certificate holder may use a person during the on-the-job portion of training to perform security functions provided that the person is closely supervised and does not make independent judgments as to whether persons or property may enter a sterile area or aircraft without further inspection.

(c) No certificate holder shall use a person to perform a screening function after that person has failed an operational test related to that function until that person has successfully completed the remedial training specified in the certificate holder's security program.

(d) Each certificate holder shall ensure that a Ground Security Coordinator conducts and documents an annual evaluation of each person assigned screening duties and may continue that person's employment in a screening capacity only upon the determination by that Ground Security Coordinator that the person:

(1) Has not suffered a significant diminution of any physical ability required to perform a screening function since the last evaluation of those abilities;

(2) Has a satisfactory record of performance and attention to duty; and

(3) Demonstrates the current knowledge and skills necessary to courteously, vigilantly, and effectively perform screening functions.

(e) Paragraphs (a) through (d) of this section do not apply to those screening functions conducted outside the United States over which the certificate holder does not have operational control.

(f) At locations outside the United States where the certificate holder has operational control over a screening function, the certificate holder may use screeners who do not meet the requirements of paragraph (a)(3) of this section, provided that at least one representative of the certificate holder who has the ability to functionally read and speak English is present while the certificate holder's passengers are undergoing security processing.

[Doc. No. 26522, 56 FR 41426, Aug. 20, 1991]

§ 108.33   Employment                   history, verification and criminal history records checks.

(a) *Scope.* The following persons are within the scope of this section:

(1) Each employee or contractor employee covered under a certification made to an airport operator, pursuant to § 107.31(n) of this chapter, made on or after November 23, 1998.

(2) Each individual issued air carrier identification media that one or more airports accepts as airport approved media for unescorted access within a security identification display area (SIDA) as described in § 107.25 of this chapter.

(3) Each individual assigned, after November 23, 1998, to perform the following functions:

(i) Screen passengers or property that will be carried in a cabin of an aircraft of an air carrier required to screen passengers under this part.

(ii) Serve as an immediate supervisor (checkpoint security supervisor (CSS)), or the next supervisory level (shift or site supervisor), to those individuals described in paragraph (a)(3)(i) of this section.

(b) *Employment history investigations required.* Each air carrier must ensure that, for each individual described in

340

paragraph (a) of this section, the following requirements are met:

(1) The individual has satisfactorily undergone Part 1 of an employment history investigation. Part 1 consists of a review of the previous 10 years of employment history and verifications of the 5 employment years preceding the date the employment history investigation is initiated as provided in paragraph (c) of this section; and

(2) If required by paragraph (c)(5) of this section, the individual has satisfied Part 2 of the employment history investigation. Part 2 is the process to determine if the individual has a criminal record. To satisfy Part 2 of the investigation the criminal records check must not disclose that the individual has been convicted or found not guilty by reason of insanity, in any jurisdiction, during the 10 years ending on the date of such investigation, of any of the crimes listed below:

(i) Forgery of certificates, false marking of aircraft, and other aircraft registration violation, 49 U.S.C. 46306;

(ii) Interference with air navigation, 49 U.S.C. 46308;

(iii) Improper transportation of a hazardous material, 49 U.S.C. 46312;

(iv) Aircraft piracy, 49 U.S.C. 46502;

(v) Interference with flightcrew members or flight attendants, 49 U.S.C. 46504;

(vi) Commission of certain crimes aboard aircraft in flight, 49 U.S.C. 46506;

(vii) Carrying a weapon or explosive aboard aircraft, 49 U.S.C. 46505;

(viii) Conveying false information and threats, 49 U.S.C. 46507;

(ix) Aircraft piracy outside the special aircraft jurisdiction of the United States, 49 U.S.C. 46502(b);

(x) Lighting violations involving transporting controlled substances, 49 U.S.C. 46315;

(xi) Unlawful entry into an aircraft or airport area that serves air carriers or foreign air carriers contrary to established security requirements, 49 U.S.C. 46314;

(xii) Destruction of an aircraft or aircraft facility, 18 U.S.C. 32;

(xiii) Murder;

(xiv) Assault with intent to murder;

(xv) Espionage;

(xvi) Sedition;

(xvii) Kidnapping or hostage taking;

(xviii) Treason;

(xix) Rape or aggravated sexual abuse;

(xx) Unlawful possession, use, sale, distribution, or manufacture of an explosive or weapon;

(xxi) Extortion;

(xxii) Armed robbery;

(xxiii) Distribution of, or intent to distribute, a controlled substance;

(xxiv) Felony arson; or

(xxv) Conspiracy or attempt to commit any of the aforementioned criminal acts.

(c) *Investigative steps.* Part 1 of the employment history investigations must be completed on all persons described in paragraph (a) of this section. If required by paragraph (c)(5) of this section, Part 2 of the employment history investigation must also be completed on all persons listed in paragraph (a) of this section.

(1) The individual must provide the following information on an application:

(i) The individual's full name, including any aliases or nicknames;

(ii) The dates, names, phone numbers, and addresses of previous employers, with explanations for any gaps in employment of more than 12 consecutive months, during the previous 10-year period;

(iii) Any convictions during the previous 10-year period of the crimes listed in paragraph (b)(2) of this section.

(2) The air carrier must include on the application form a notification that the individual will be subject to an employment history verification and possibly a criminal records check.

(3) The air carrier must verify the identity of the individual through the presentation of two forms of identification, one of which must bear the individual's photograph.

(4) The air carrier must verify the information on the most recent 5 years of employment history required under paragraph (c)(1)(ii) of this section. Information must be verified in writing, by documentation, by telephone, or in person.

(5) If one or more of the conditions (triggers) listed in §108.33(c)(5) (i)

through (iv) exist, the employment history investigation must not be considered complete unless Part 2 is accomplished. Only the air carrier may initiate Part 2. Part 2 consists of a comparison of the individual's fingerprints against the fingerprint files of known criminals maintained by the Federal Bureau of Investigation (FBI). The comparison of the individual's fingerprints must be processed through the FAA. The air carrier may request a check of the individual's fingerprint-based criminal record only if one or more of the following conditions exist:

(i) The individual does not satisfactorily account for a period of unemployment of 12 consecutive months or more during the previous 10-year period.

(ii) The individual is unable to support statements made on the application form.

(iii) There are significant inconsistencies in the information provided on the application.

(iv) Information becomes available to the air carrier during the investigation indicating a possible conviction for one of the crimes listed in paragraph (b)(2) of this section.

(d) *Individual notification.* Prior to commencing the criminal records check, the air carrier must notify the affected individuals and identify a point of contact for follow-up. An individual who chooses not to submit fingerprints may not be granted unescorted access privilege and may not be allowed to hold screener or screener supervisory positions.

(e) *Fingerprint processing.* If a fingerprint comparison is necessary under paragraph (c)(5) of this section to complete the employment history investigation the air carrier must collect and process fingerprints in the following manner:

(1) One set of legible and classifiable fingerprints must be recorded on fingerprint cards approved by the FBI and distributed by the FAA for this purpose.

(2) The fingerprints must be obtained from the individual under direct observation by the air carrier or a law enforcement officer. Individuals submitting their fingerprints must not take possession of their fingerprint card after they have been fingerprinted.

(3) The identify of the individual must be verified at the time fingerprints are obtained. The individual must present two forms of identification, one of which must bear the individual's photograph.

(4) The fingerprint card must be forwarded to FAA at the location specified by the Administrator.

(5) Fees for the processing of the criminal records checks are due upon application. Air carriers must submit payment through corporate check, cashier's check, or money order made payable to "U.S. FAA," at the designated rate for each fingerprint card. Combined payment for multiple applications is acceptable. The designated rate for processing the fingerprint cards is available from the local FAA security office.

(f) *Determination of arrest status.* In conducting the criminal record checks required by this section, the air carrier must not consider the employment history investigation complete unless it investigates arrest information for the crimes listed in paragraph (b)(2) of this section for which no disposition has been recorded and makes a determination that the arrest did not result in a disqualifying conviction.

(g) *Availability and correction of FBI records and notification of disqualification.* (1) At the time Part 2 is initiated and the fingerprints are collected, the air carrier must notify the individual that a copy of the criminal record received from the FBI will be made available to the individual if requested in writing. When requested in writing, the air carrier must make available to the individual a copy of any criminal record received from the FBI.

(2) Prior to making a final decision to deny authorization to an individual described in paragraph (a) of this section, the air carrier must advise the individual that the FBI criminal record discloses information that would disqualify him/her from positions covered under this rule and provide him/her with a copy of their FBI record if requested.

(3) The air carrier must notify an individual that a final decision has been made to forward or not forward a letter

342

**Federal Aviation Administration, DOT**

**§ 108.33**

of certification for unescorted access to the airport operator, or to grant or deny the individual authority to perform screening functions listed under paragraph (a)(3) of this section.

(h) *Corrective action by the individual.* The individual may contact the local jurisdiction responsible for the information and the FBI to complete or correct the information contained in his/her record before the air carrier makes any decision to withhold his/her name from a certification, or not grant authorization to perform screening functions subject to the following conditions:

(1) Within 30 days after being advised that the criminal record received from the FBI discloses disqualifying information, the individual must notify the air carrier, in writing, of his/her intent to correct any information believed to be inaccurate.

(2) Upon notification by an individual that the record has been corrected, the air carrier must obtain a copy of the revised FBI record prior to making a final determination.

(3) If no notification is received within 30 days, the air carrier may make a final determination.

(i) *Limits on dissemination of results.* Criminal record information provided by the FBI must be used solely for the purposes of this section, and no person may disseminate the results of a criminal record check to anyone other than:

(1) The individual to whom the record pertains or that individual's authorized representative;

(2) Air carrier officials with a need to know; and

(3) Others designated by the Administrator.

(j) *Employment status while awaiting criminal record checks.* Individuals who have submitted their fingerprints and are awaiting FBI results may perform work details under the following conditions:

(1) Those seeking unescorted access to the SIDA must be escorted by someone who has unescorted SIDA access privileges;

(2) Those applicants seeking positions covered under paragraphs (a)(3) and (a)(4) of this section, may not exercise any independent judgments regarding those functions.

(k) *Recordkeeping.* (1) The air carrier must physically maintain and control Part 1 employment history investigation file until 180 days after the termination of the individual's authority for unescorted access or termination from positions covered under paragraph (a)(3) of this section. Part 1 of the employment history investigation, completed on screening personnel must be maintained at the airport where they perform screening functions. Part 1 of the employment history investigation file must consist of the following:

(i) The application;

(ii) The employment verification information obtained by the employer;

(iii) the names of those from whom the employment verification information was obtained;

(iv) The date and the method of how the contact was made; and

(v) Any other information as required by the Administrator.

(2) The air carrier must physically maintain, control and when appropriate destroy Part 2, the criminal record file, for each individual for whom a fingerprint comparison has been made. Part 2 must be maintained for 180 days after the termination of the individual's authority for unescorted access or after the individual ceases to perform screening functions. Only direct air carrier employees may carry out Part 2 responsibilities. Part 2 must consist of the following:

(i) The results of the record check; or

(ii) Certification from the air carrier that the check was completed and did not uncover a disqualifying conviction.

(3) The files required by this paragraph must be maintained in a manner that is acceptable to the Administrator and in a manner that protects the confidentiality of the individual.

(l) *Continuing responsibilities.* (1) Any individual authorized to have unescorted access privilege to the SIDA or who performs functions covered under paragraph (a)(3) of this section, who is subsequently convicted of any of the crimes listed in paragraph (b)(2) of this section must, within 24 hours, report the conviction to the air carrier and surrender the SIDA access medium or any employment related identification medium to the issuer.

343

(2) If information becomes available to the air carrier indicating that an individual has a possible conviction for one of the disqualifying crimes in paragraph (b)(2) of this section, the air carrier must determine the status of the conviction and, if the conviction is confirmed:

(i) Immediately revoke access authorization for unescorted access to the SIDA; or

(ii) Immediately remove the individual from screening functions covered under paragraph (a)(3) of this section.

(m) *Air carrier responsibility.* The air carrier must:

(1) Designate an individual(s), in the security program, to be responsible for maintaining and controlling the employment history investigation for those whom the air carrier has made a certification to an airport operator under §107.31(n)(1) of this chapter and for destroying the criminal record files when their maintenance is no longer required by paragraph (k)(2) of this section.

(2) Designate individual(s), in the security program, to maintain and control Part 1 of the employment history investigations of screeners whose files must be maintained at the location or station where the screener is performing his or her duties.

(3) Designate individual(s), in the security program, to serve as the contact to receive notification from an individual applying for either unescorted access or those seeking to perform screening functions of his or her intent to seek correction of his or her criminal record with the FBI.

(4) Designate an individual(s), in the security program, to maintain and control Part 2 of the employment history investigation file for all employees, contractors, or others who undergo a fingerprint comparison at the request of the air carrier.

(5) Audit the employment history investigations performed in accordance with this section. The audit process must be set forth in the air carrier approved security program.

[Doc. No. 28859, 63 FR 51220, Sept. 24, 1998; 63 FR 60448, Nov. 9, 1998]

## PART 109—INDIRECT AIR CARRIER SECURITY

Sec.
109.1  Applicability.
109.3  Security program.
109.5  Approval of security programs and amendments.

AUTHORITY: 49 U.S.C. 106(g), 5103, 40113, 40119, 44701–44702, 44705, 44901–44905, 44907, 44913–44914, 44932, 44935–44936, 46105.

### § 109.1  Applicability.

(a) This part prescribes aviation security rules governing each air carrier, including each air freight forwarder and each cooperative shippers' association, engaged indirectly in air transportation of property;

(b) For the purposes of this part, *property* means any package cargo.

[Doc. No. 15840, 44 FR 72345, Dec. 13, 1979]

### § 109.3  Security program.

(a) Each indirect air carrier shall adopt and carry out a security program that—

(1) Is designed to prevent or deter the unauthorized introduction of any explosive or incendiary device into any package cargo intended for carriage by air;

(2) Is in writing and signed by the carrier or any person delegated authority in this matter;

(3) Includes a system of security safeguards acceptable to the Administrator; and

(4) Has been approved by the Administrator.

(b) Each indirect air carrier shall maintain at least one complete copy of its security program at its principal business office, and a complete copy or the pertinent portions of its security program or appropriate implementing instructions at each office where package cargo is accepted, and shall make those documents available for inspection upon request of any Civil Aviation Security Special Agent.

(c) Each indirect air carrier shall—

(1) Restrict the distribution, disclosure, and availability of sensitive security information, as defined in part 191 of this chapter, to persons with a need-to-know; and

(2) Refer requests for sensitive security information by other persons to